2007 ME 85

**Gregory G. GENSHEIMER et al.**

v.

**TOWN OF PHIPPSBURG.**

Supreme Judicial Court of Maine.

Submitted On Briefs: Feb. 26, 2007.

Decided: July 10, 2007.

Geoffrey H. Hole, Esq., Joan M. Fortin, Esq., Bernstein Shur Sawyer & Nelson, P.A., Portland, for plaintiffs.

John F. Barnicle, Esq., Richard L. Hornbeck, Esq., Jessica L. Maher, Esq., Moncure & Barnicle, Brunswick, for defendant.

Panel: CLIFFORD, ALEXANDER, CALKINS, LEVY, and SILVER, JJ.

Majority: CLIFFORD, CALKINS, LEVY, and SILVER, JJ.

Dissent: ALEXANDER, J.

SILVER, J.

[¶ 1] The Town of Phippsburg appeals from a judgment of the Superior Court

(Sagadahoc County, *Delahanty, J.*) vacating the decision of the Town of Phippsburg Zoning Board of Appeals that upheld the Town Planning Board's denial of Gregory G. Gensheimer's and Kathleen F. Gensheimer's application to construct a new road to access their home. The Town contends that the Superior Court erred in its interpretation of the Phippsburg Shoreland Zoning Ordinance. We agree and vacate the judgment of the Superior Court.

## I. BACKGROUND

[¶ 2] The relevant facts of this case are undisputed.[1] The Gensheimers own real property in a subdivision located in the Town's Resource Protection District (RPD). The Gensheimers reside on this property in a house built in 1895. Pursuant to the Phippsburg Shoreland Zoning Ordinance (Ordinance), their house is a legally existing non-conforming use.

[¶ 3] In August 2002, the Gensheimers applied to the Planning Board seeking a permit to develop a roadbed as an alternate means to access their property. The Planning Board denied their request, and the Board of Appeals and the Superior Court both affirmed the decision. The Gensheimers appealed, and we vacated the judgment of the Superior Court and remanded to the Planning Board for further findings. *Gensheimer v. Town of Phippsburg (Gensheimer I)*, 2005 ME 22, ¶ 1, 868 A.2d 161, 163.

[¶ 4] The center of the parties' dispute in 2002 and the instant appeal is the meaning of language found in three separate sections of the Ordinance. Section 12 of the Ordinance governs non-conforming uses, and states "[i]t is the intent of this Ordinance to promote land use conformities, except that non-conforming conditions that existed before the effective date of this Ordinance shall be allowed to continue, subject to the requirements set forth in this section." Phippsburg, Me., Shoreland Zoning Ordinance § 12(A) (June 5, 1993).

[¶ 5] Section 14 of the Ordinance contains a table listing various types of land use activities and whether they are allowed in each of the Town's districts. Phippsburg, Me., Shoreland Zoning Ordinance § 14 (June 5, 1993). The Land Use Table indicates that single-family homes are prohibited in the RPD. Phippsburg, Me., Shoreland Zoning Ordinance § 14.15.A (June 5, 1993). It also prohibits road and driveway construction in the RPD, "[e]xcept to provide access to permitted uses within the district, or where no reasonable alternative route or location is available outside the RP area, in which case a permit is required from the Planning board." Phippsburg, Me., Shoreland Zoning Ordinance § 14.26 & n.7 (June 5, 1993).

[¶ 6] Finally, section 15 of the Ordinance outlines land use standards for the activities listed in section 14. Phippsburg, Me., Shoreland Zoning Ordinance § 14 (June 5, 1993). Land use standards for the construction of roads and driveways state:

> New roads and driveways are prohibited in a Resource Protection District except to provide access to permitted uses within the district, or as approved by the Planning Board upon a finding that no reasonable alternative route or location is available outside the district, in which case the road and/or driveway shall be set back as far as practicable from the normal high-water line of a water body, tributary stream, or upland edge of a wetland.

Phippsburg, Me., Shoreland Zoning Ordinance § 15(H)(3) (June 5, 1993).

---

1. A significant part of the history of this dispute is stated in *Gensheimer v. Town of Phippsburg*, 2005 ME 22, 868 A.2d 161.

[¶ 7] In *Gensheimer I*, we found that "a permit is required to construct a roadway only when there is no reasonable alternative access to a non-permitted use, and that no permit is required to construct such a roadway when the applicant's use is a permitted use, regardless of whether there is a reasonable alternative." 2005 ME 22, ¶ 23, 868 A.2d at 168. On remand and following hearings conducted in May and June 2005, the Planning Board determined that the Gensheimers' home was not a permitted use in the RPD, and thus required a permit to construct a roadway. The Zoning Board of Appeals affirmed. Pursuant to M.R. Civ. P. 80B, the Gensheimers filed a complaint in Superior Court. The court vacated the decisions of the Zoning Board of Appeals and the Planning Board, finding that the Gensheimers' residence, though non-conforming, is a permitted use in the RPD. The Town filed this appeal.

## II. DISCUSSION

### A. Standard of Review

[¶ 8] We review the construction of the Ordinance *de novo*. *Isis Dev., LLC v. Town of Wells*, 2003 ME 149, ¶ 3, 836 A.2d 1285, 1287 (citation omitted). The terms and expressions in the Ordinance will be "construed reasonably with regard to both the objectives sought to be obtained and the general structure of the ordinance as a whole." *Gerald v. Town of York*, 589 A.2d 1272, 1274 (Me.1991) (citation omitted).

### B. Ordinance Interpretation

[¶ 9] The Town contends that the Superior Court erred as a matter of law by concluding that the Ordinance treats both "allowed" and "legally existing non-conforming" uses as "permitted" uses. The Town argues that allowing legally existing non-conforming uses to continue pursuant to section 12 of the Ordinance does not transform them into allowed or permitted uses (hereinafter collectively referred to as "permitted uses") in the RPD pursuant to sections 14 and 15 of the Ordinance. Accordingly, the Town argues, the Ordinance does not entitle the Gensheimers to develop a road to access their home without a permit because their home is a prohibited use in the RPD, and road development in the RPD is only allowed to provide access to permitted uses within the RPD.

[¶ 10] The Gensheimers argue that the term "permitted" should be attributed its common and generally accepted meaning of "allowed" because of our decision in *Gerald*. Under an ordinary meaning interpretation, the Gensheimers contend that because their home is allowed to continue under the Ordinance as a legally existing non-conforming use, it is a permitted use in the RPD.

[¶ 11] Legally existing non-conforming uses in the Ordinance are uses other than permitted uses. By its terms and by its structure, the Ordinance is not neutral with respect to its treatment of non-conforming uses and permitted uses.

[¶ 12] Non-conforming uses are subject to separate and more stringent land use standards than are permitted uses. Section 12 of the Ordinance is entitled "Non-conformance," and sets out in its purpose subsection that "[i]t is the intent of this Ordinance to promote land use conformities, except that non-conforming conditions that existed before the effective date of this Ordinance shall be allowed to continue, *subject to the requirements set forth in this section*." Phippsburg, Me., Shoreland Zoning Ordinance § 12(A) (June 5, 1993) (emphasis added). The subsections that follow detail the land use requirements and restrictions for non-conforming uses, including restrictions on transfer of ownership, repair and maintenance, expansions, relocation, reconstruction, and change of

use. Phippsburg, Me., Shoreland Zoning Ordinance § 12(B)-(E) (June 5, 1993). Save for normal upkeep and maintenance, no change or addition to a non-conforming use may occur without first obtaining a permit from the Planning Board. Phippsburg, Me., Shoreland Zoning Ordinance § 12(B)(2) (June 5, 1993). In determining whether to issue a permit, the Planning Board is limited by the express criteria and land use requirements described in each subsection.

[¶ 13] Whereas non-conforming uses must comply with the land use standards detailed in section 12, permitted uses listed in the Land Use Table are governed by the land use standards outlined in section 15. Phippsburg, Me., Shoreland Zoning Ordinance § 14 (June 5, 1993). The Ordinance's dichotomized treatment of the different use types supports the Town's contentions that non-conforming uses are distinct from permitted uses, and that non-conforming uses are regulated by and confined to section 12's land use standards. This structural differentiation would be defeated if the Gensheimers were permitted to operate outside of section 12's land use standards, which include permit requirements and Planning Board oversight.

■ [¶ 14] Even assuming for the sake of argument that the Gensheimers are correct in their assertion that the Land Use Table and section 15 allow them to develop a road to access their non-conforming use, the statutory directive built into the Ordinance militates against giving that language any operative effect. Section 7 of the Ordinance states "[w]henever a provision of this Ordinance conflicts with or is inconsistent with another provision of this Ordinance ..., the more restrictive provision shall control." Phippsburg, Me., Shoreland Zoning Ordinance § 7 (June 5, 1993). Section 12 does not provide for road development. Allowing a non-con-

forming use to go beyond what is sanctioned in section 12 is inconsistent with the instruction that non-conforming uses are only allowed to continue subject to the requirements set forth in section 12. If section 12 did sanction road development, because it goes beyond normal upkeep and maintenance of the non-conforming use, a permitting procedure would attach to ensure that the Planning Board determined whether the road met the land use standards for non-conforming uses. Thus, even if non-conforming uses could be construed as permitted uses based on language in the table and subsection 15(H)(3), the more restrictive language in section 12 controls because the result would otherwise be inconsistent with the rest of the Ordinance.

[¶ 15] Additionally, according permitted uses a distinct and preferred status over legally existing non-conforming uses comports with the purpose of the Ordinance to protect shoreland areas. The RPD "includes areas in which development would adversely affect water quality, productive habitat, biological ecosystems, or scenic and natural values." Phippsburg, Me., Shoreland Zoning Ordinance § 13(A) (June 5, 1993). Uses that are allowed in the RPD without a permit include: nonintensive recreational uses, forest management activities except for timber harvesting, soil and water conservation practices, wildlife management, and signs. Phippsburg, Me., Shoreland Zoning Ordinance § 14 (June 5, 1993). These permitted uses in the RPD are of a public nature, rather than private. They also share in common a relatively low adverse environmental impact. In contrast, the Gensheimers' residence and proposed road are private uses and both have a high adverse environmental impact on an already fragile ecosystem. Categorizing the Gensheimers' home as a permitted use would allow them to exploit their position as a grandfathered use for a

purely private purpose. This outcome is not germane to the underlying policy of the Ordinance.

[¶ 16] We also disagree with the Gensheimers' assertion that our decision in *Gerald* controls the outcome of this case. In *Gerald,* we confronted a similar issue as is raised in the instant case. Gerald applied to the Town of York Planning Board for a permit under the Wetlands Permit Ordinance to allow her to improve a road leading to her campground, a legally existing non-conforming use. *Gerald,* 589 A.2d at 1273. The Wetlands Permit Ordinance provided that a wetlands permit may be issued for "[u]ses as permitted under the Zoning Regulations of the York Beach Village Corporation and Shoreland Zoning." *Id.* at 1274.

[¶ 17] The Planning Board found that the Wetlands Permit Ordinance only allows wetlands permits to be issued for a list of uses in the Zoning Ordinance categorized as "permitted uses." *Id.* The Planning Board therefore denied Gerald's application because "campground" was not listed as a permitted use in the Zoning Ordinance. *Id.* at 1273 & n. 3. We vacated the decision of the Planning Board. *Id.* at 1275. Basing our analysis only on the provisions of the Wetlands Permit Ordinance and not the cross-referenced Zoning Ordinances, we determined "[i]n light of its stated objectives and structure, we conclude that the Wetlands Permit Ordinance is neutral with respect to 'permitted uses' and 'nonconforming uses' and will tolerate both as long as the uses do not adversely impact protected wetlands." *Id.* at 1274–75. Thus, we found that the Planning Board erred in interpreting the Wetlands Permit Ordinance as only allowing uses expressly listed as "permitted uses" under the Zoning Ordinance. *Id.* at 1275.

[¶ 18] The matter before us is distinguishable from *Gerald.* One difference is ordinance structure. The Wetlands Permit Ordinance considered in *Gerald* did not independently regulate non-conforming uses; instead it incorporated by cross-reference other local ordinances' regulations applicable to non-conforming uses. In contrast, the Phippsburg Shoreland Zoning Ordinance has internal regulations that govern non-conforming uses in all districts, including the RPD. Another difference is the consequence of treating a non-conforming use as a permitted use. In *Gerald,* treating non-conforming uses as permitted uses merely meant that non-conforming uses were eligible to receive wetlands permits. In contrast, under the Phippsburg Shoreland Zoning Ordinance as interpreted in *Gensheimer I,* treating non-conforming uses as permitted uses would mean that the owners of a non-conforming use could develop a road access without having to apply for and obtain a permit.

The entry is:

Judgment vacated and remanded to the Superior Court with instructions to remand the matter to the Board of Appeals with instructions to remand to the Planning Board for further proceedings consistent with this opinion.

ALEXANDER, J., dissenting.

[¶ 19] I respectfully dissent. The Court's opinion correctly outlines the statutes and ordinances that govern this case. As the Court notes, we review the interpretation of ordinances de novo. In that review, we construe the words of an ordinance according to their plain meaning, looking to both the objectives sought by the ordinance and the structure of the ordinance as a whole. *Gerald v. Town of York,* 589 A.2d 1272, 1274 (Me.1991). Under the Phippsburg ordinance, the Gensheimers' occupancy and use of their home is a grandfathered, non-conforming use, and thus, a permitted use under the ordi-

nance. We held that such a grandfathered, non-conforming use was a permitted use in *Gerald,* 589 A.2d at 1273–75. Because the Gensheimers' home is a permitted use, the Superior Court did not err in concluding that the driveway the Gensheimers propose to construct was appropriate to provide access to their permitted use within the Resource Protection District. I would affirm the judgment of the Superior Court.